2011 OK 24

**Cassidy Jane SHOLER,
Plaintiff/Appellant,**

v.

**ERC MANAGEMENT GROUP, LLC, ERC Properties, Inc., and Edmond Housing Associates III, Limited Partnership d/b/a Crownridge Apartments, Defendants/Appellees.**

No. 108,024.

Supreme Court of Oklahoma.

April 5, 2011.

Rehearing Denied June 30, 2011.

Kevin E. Krahl, Fuller Tubb Bickford & Krahl PLLC, Oklahoma City, Oklahoma, for Plaintiff/Appellant.

Glen Mullins, Kaci L. Trojan, Durbin, Larimore & Bialick, Oklahoma City, Oklahoma, for Defendants/Appellees.

WATT, J.:

¶ 1 The dispositive issue[1] presented is whether sufficient evidence was presented

---

1. Resolution of this issue makes it unnecessary to address Sholer's allegations that the trial court erred in allowing the apartment complex to file the motion for summary judgment out of time. In addition, because the cause is governed by Oklahoma's jurisprudence involving the nature

during the summary proceedings to create a question of fact on the open and obvious nature of the danger of diving head first into the pool owned and operated by the apartment complex. We have reviewed the merits of the summary judgment proceeding in light of the heavy burden, especially pronounced in negligence suits, resting on the moving party. Before a court may properly grant such a motion it must clearly appear that the movant is entitled to judgment as a matter of law, viewing the supporting material in the light most favorable to the opponent.[2] Unquestionably, if reasonable individuals exercising fair and impartial judgment could differ, summary judgment is unwarranted.[3]

■■ ¶ 2 Property owners have a duty to exercise care to keep their premises reasonably safe from hidden dangers, traps, snares and the like.[4] Sholer's familiarity with the fact that diving head first into a pool presents a danger of injury is not fatal to her recovery.[5] Her testimony that the lighting of the pool left the impression that the water was five- to six-feet,[6] bolstered by that of her rescuer that he could not determine the depth of the water until he had actually entered the pool,[7] along with conflicting evidence concerning no diving signage and

depth markers around the pool is sufficient to create a question of fact for resolution by the trier of fact.

■ ¶ 3 Whether a defect is open or obvious or whether the offending condition presents a deceptively innocent appearance, presents a question for the trier of fact.[8] A question of fact exists regarding whether the danger of diving head first into the pool was an open or obvious danger or whether the diver was presented with a deceptively innocent appearance of safety which cloaked the reality of danger. Upon *de novo* review,[9] we determine that the entrance of summary judgment was inappropriate as the resolution of this cause.[10]

## CONTESTED FACTS

¶ 4 On May 31, 2005, Sholer was visiting friends at the apartment complex. That evening, at approximately 11:30 p.m., Sholer and one of her friends entered the apartment complex pool. Sholer alleged that both gates leading into the pool area were unlocked and that the pool lights were activated. In addition, she asserts that there was no signage prohibiting diving, unsupervised swimming, or indicating the depth of the pool. When Sholer attempted a shallow water dive, her

of open and obvious dangers, it is unnecessary to discuss the cases from other forums cited by either of the parties.

2. *Phelps v. Hotel Management, Inc.*, 1996 OK 114 ¶ 7, 925 P.2d 891; *Martin v. Aramark Services, Inc.*, see note 9, infra; *Ross v. City of Shawnee*, 1984 OK 43, ¶ 16, 683 P.2d 535.

3. *Roper v. Mercy Health Center*, see note 30, infra; *Spirgis v. Circle K Stores*, see note 34, infra.

4. *Brown v. Nicholson*, see note 24, infra.

5. *Id.*

6. See ¶ 7 and accompanying footnotes.

7. *Id.*

8. *Jack Healey Linen Service Co. v. Travis*, see note 32, infra.

9. Matters of summary adjudication are subject to this Court's *de novo* review. *Reeds v. Walker*, 2006 OK 43, ¶ 9, 157 P.3d 100; *Martin v. Aramark Services, Inc.*, 2004 OK 38, ¶ 4, 92 P.3d 96;

*Manley v. Brown*, 1999 OK 79, ¶ 22, 989 P.2d 448.

10. This matter differs from *Smith v. American Flyers, Inc.*, 1975 OK CIV APP 32, 540 P.2d 1212. In *Smith*, the appellate court determined that the proprietor of the swimming pool had no duty to a diver who was injured when attempting to make a dive through an inner tube that the diver or his companions had brought to the pool. In that case, the diver himself created the hazard, an open and obvious danger. Furthermore, there were no allegations that the diver was misled as to the conditions in the pool or that his attention was distracted in some way. The cause is also distinguishable on its facts from those presented by *King v. Lunsford*, 1993 OK CIV APP 70, 852 P.2d 821 in which the Court of Civil Appeals found that a property vendor owed no duty to a guest of the purchaser's social guest who was injured in a pool by a collapsing ladder where she had prior knowledge of the defective nature of the same. Finally, opinions released for publication by order of the Court of Civil Appeals are persuasive only and lack precedential effect. Rule 1.200, Supreme Court Rules, 12 O.S.2001, Ch. 15, App. 1; 20 O.S.2001 30.5 and 30.14.

head struck the bottom of the pool rendering her a quadriplegic.

¶5 Sholer filed a second amended petition on January 22, 2009 alleging her injuries resulted from the apartment complex's negligence. She insisted that the apartment complex had violated the duty to keep the pool area safe by not: locking the gates in a secure manner; providing adequate lighting in and around the vicinity; posting clear and visible signage warning and/or prohibiting diving and indicating the shallow end of the pool; and forbidding unsupervised swimming. In answering, the apartment complex denied being negligent in any matter and contended that the condition of the premises was open and obvious, preventing recovery. ERC also took the position that there were "no diving" signs in the pool area which were easily visible and that the depth of the pool was clearly marked on the pool decking.

¶6 On January 5, 2010, the apartment complex filed a motion for summary judgment asserting that it had no duty to protect Sholer from the open and obvious danger of diving head first into the pool. It characterized as undisputed a number of facts including: 1) Sholer had been drinking and was at least "mildly intoxicated" on the night of the accident; 2) entrance to the pool area oc-curred after the hour when the pool was designated to be closed; 3) the dive was executed within a few feet of depth markers indicating that the pool was only three (3) feet deep; 4) Sholer understood it was dangerous to dive into a pool without knowing its depth; and 5) Sholer attempted a shallow-water dive because she understood she could be injured by hitting her head on the bottom if the pool were shallow. Several photographs allegedly depicting the condition of the pool on the night of the accident were attached to the motion for summary judgment indicating a posting of pool rules, a "no diving allowed" sign, and pictures of depth markings around the pool area.

¶7 The apartment complex acknowledged the existence of a dispute as to whether the gate into the pool area was locked on the night of the accident.[11] Sholer admitted that she had been drinking the night of the accident and that she appreciated the risk of diving into waters of unknown depth. Nevertheless, she also stated that she was "extremely coherent" when she entered the pool area[12] and that she did not feel that diving into the pool was dangerous[13] or that she was at risk for injury by doing a shallow dive.[14] Sholer testified that she did not see "no diving"[15] signs or depth markers[16] in the

11. Deposition of Jane Sholer, October 27th, 2009, providing in pertinent part at p. 83:
   "... Q. All right. And you understand that there's a dispute in this case regarding whether or not the gate was locked at the time of—that you went to the pool area?
   A. Yes.
   Q. You understand there's been a security officer who testified that depending on the situation, he thought that he would have locked it?
   A. Yes...."

12. Deposition of Jane Sholer, October 27th, 2009, providing in pertinent part at p. 94:
   "... Q.... How would you describe your condition as far as-like here it says mildly intoxicated. How would you describe your condition at the time that you dove into the pool that night?
   A. I would say I was extremely coherent and with it because I remember so many details and thoughts. I would say mildly intoxicated would be just [sic] was of describing the way I was...."

13. Deposition of Jane Sholer, October 27th, 2009, providing in pertinent part at p. 96:

"... Q. All right. And tell me them again.
A. Okay. I'm sorry. I would say just entering the area it was—it seemed at the time inviting. It was—there was—there were still lights on. There were no markers that were visible to me. I certainly don't remember seeing any No Diving signs.
Q. Okay. Did you think it was safe in diving, even when you did not know the depth in the area where you were diving?
A. I don't think it was—I don't think it was—I didn't think it was dangerous...."

14. Deposition of Jane Sholer, October 27, 2009 providing in pertinent part at pp. 68–69:
   "... Q. All right. Did you know that if you dove into a pool without knowing the—how deep the water is that there was a risk that you would hit your head on the bottom of the pool?
   A. No, not the way I was planning on—the way I dove in .... I was trying to do a racer's dive where I was supposed to just skim under the water ..."

15. Deposition of Jane Sholer, October 27, 2009, providing in pertinent part at p. 19:
   "... Q. Okay. In the response to Interrogatory Number 8, you say that you looked to

pool area and that **the steps into the pool and the lighting made the pool look "fairly deep," approximately five to six feet.**[17] In answer to interrogatories, **Sholer stated that the lighting created shadows in the swimming pool causing the depth of the water to be deceptive.**[18] Sholer's testimony concerning the lack of a specific "no diving" sign and the absence of markings on the pool deck were substantiated by other deposition testimony.[19] Furthermore, even the apartment complex's security guard could not verify whether there was a "no diving" sign in the pool area on the night of the accident.[20] Finally, the young man who went in the water to rescue Sholer testified that he could not tell how deep the water was until he actually entered the pool.[21]

¶ 8 A corrected order granting summary judgment was entered in the apartment complex's favor on February 12, 2010. Sholer appealed and the Court of Civil Appeals affirmed, finding undisputed proof of the open and obvious condition of the pool at the time of the incident. We granted certiorari on December 14, 2010.

¶ 9 **Resolution by summary adjudication is inappropriate where fact issues exist regarding whether the danger of diving head first into the pool was an open or obvious danger or whether the diver was presented with a deceptively innocent appearance of safety which cloaked the reality of danger.**

■ ¶ 10 The apartment complex alleges that it is unnecessary to resolve the question of Sholer's entry status whether as a trespasser, licensee, or invitee. It contends that

---

make sure there was water in the swimming pool and to see if you could see the bottom. And that you did not notice No Diving Signs. Were you able to tell when you looked in the pool how deep the pool was? No...."

16. Deposition of Jane Sholer, October 27, 2009, providing in pertinent part:

at p. 51: "... Q. At any time before you dove in, did you have any information regarding how deep the pool was?
A. No.
Q. Did you ever see any depth marker signs in the pool area?
A. No.
Q. Are you able to tell us that there were no depth markers there? Or are you saying that you just didn't see them?
A. I would say I'm about 80 percent sure that there weren't any...."

at p. 54: "... Q. Have you seen the photographs that were taken during the pool construction that shows the depth markers inside of the swimming pool?
A. Yes.
Q. All right. Are you able to tell us—well, are you testifying today that those depth markers were not there at the time of your accident?
A. No.
Q. All right. Do you recall seeing the depth markers?
A. No...."

17. Deposition of Jane Sholer, October 27th, 2009, providing in pertinent part at p. 75:
"... Q. Okay. Once you took the surroundings in like you told us about, before you dove into the pool, what made you think that it was safe for you to dive in?
A. I guess noting the amount of steps going into the side and the lights being on in the

water, it made the pool look fairly deep. So that's what I'm guessing why I went ahead and did that.
Q. Did you reach a conclusion before you dove in as to what fairly deep—I mean how deep that the pool was in the area where you dove?
A. I was thinking, and this is just from memory, maybe five, six feet...."

18. Plaintiff's Answers to Defendants' First Interrogatories to Plaintiff, May 11, 2009, answers to Interrogatory No. 7 and Interrogatory No. 11.

19. Deposition of Michael Colley, July 7, 2009; Deposition of Travis Locke, July 13, 2009; Deposition of Cody Vickrey, July 6, 2009.

20. Deposition of Bervis Littles, June 22, 2009, providing in pertinent part at pp. 28–29:

"... A. There are deposition exhibits here and one is Deposition Exhibit Number 1 here. It's to Ms. Regan's deposition. And there's a sign, no diving sign there. Do you have any recollection of any no diving signs that were up at the pool at the time of this incident in '05?
A. I mean I—I want to say normally there are signs up, but I can't tell you on this particular date and time if there were signs up or not...."

21. Deposition of Adam Lock, July 13, 2009, providing in pertinent part at p. 96:

"... Q. —the movements you were making. But were you able to tell how deep it was at that time before you went into the water?
A. No, not until I had entered it, entered the water...."

the pool and its depth were an open and obvious danger that any prudent person would have recognized, relieving them of the duty to protect even an invitee. Sholer disagrees, asserting that she presented sufficient evidence to require that the issue of the nature of the hazard be resolved by the trier of fact. We agree with the assertion.

■ ¶ 11 The threshold question in any negligence action is whether the defendant has a duty to the plaintiff.[22] Central to this issue is the status of the individual as a trespasser, a licensee, or an invitee. If the individual is a trespasser, the landlord's only duty is to avoid a wilful or wanton injury.[23] An owner owes a licensee the duty to exercise reasonable care in disclosing dangerous defects known to the proprietor but unlikely to be discovered by the licensee.[24] The obligation extends to hidden dangers, traps, snares, and similar conditions.[25] An owner owes an invitee the additional duty of exercising reasonable care to keep the premises in a reasonably safe condition for the visitor's reception.[26]

■ ¶ 12 Although the invitee is entitled to the greatest protection of the three categories, the landowner need not guard the invitee against dangers so apparent and readily observable that the conditions should be discovered.[27] Both invitees and licensees are protected from conditions in the nature of hidden dangers, traps, snares, and the like.

■ ¶ 13 We have rejected the "open and obvious defense" in a number of cases where the condition or defect was visible but unseen by the plaintiff.[28] **A danger need not be totally or partially obscured from vision or withdrawn from sight to be considered hidden. Rather, it may encompass a condition presenting a deceptively innocent appearance of safety, cloaking a reality of danger.**[29] It may also arise from circumstances diverting the plaintiff's attention from the danger.[30] Therefore, not every "observable" condition is "open and obvious" as a matter of law.[31] Whether harm from an open and obvious defect may be actionable depends on an objective due care standard, *i.e.*, whether under similar circumstances a prudent person would be able to see the

**22.** *Pickens v. Tulsa Metropolitan Ministry,* 1997 OK 152, ¶ 8, 951 P.2d 1079; *Grover v. Superior Welding, Inc.,* 1995 OK 14, ¶ 5, 893 P.2d 500; *Rose v. Sapulpa Rural Water Co.,* 1981 OK 85, ¶ 17, 631 P.2d 752.

**23.** *Pickens v. Tulsa Metropolitan Ministry,* see note 22, supra.

**24.** *Brown v. Nicholson, Pate, & Spears,* 1997 OK 32, ¶ 6, 935 P.2d 319; *Henryetta Constr. Co. v. Harris,* 1965 OK 88, ¶¶ 13–14, 408 P.2d 522, 28 A.L.R.3d 876 [Supplemental opinion on rehearing.].

**25.** *Brown v. Nicholson, Pate, & Spears,* see note 24, supra.

**26.** *Henryetta Constr. Co. v. Harris,* see note 24, supra; *Rogers v. Hennessee,* 1979 OK 138, ¶ 3, 602 P.2d 1033.

**27.** *Pickens v. Tulsa Metropolitan Ministry,* see note 22, supra; *Henryetta Constr. Co. v. Harris,* see note 24, supra.

**28.** *Phelps v. Hotel Management, Inc.,* see note 2, supra [Plaintiff struck head and was injured by observable glass bowl protruding into seating area.]; *Zagal v. Truckstops Corp. of America,* see note 31, infra [Jury question existed as to whether cardboard box was concealed danger.]; *Roper v. Mercy Health Center,* see note 30, infra [Fixture installed in sidewalk was observable but obscured by foot traffic.]; *Spirgis v. Circle K Stores, Inc.,* see note 34, infra [Whether pothold was a hidden danger because of traffic created a question of fact.]. See also, *Nider v. Republic Parking, Inc.,* 2007 OK CIV APP 95, 169 P.3d 738 [Question of fact existed on whether invitee was aware of dangerous condition where owner had reason to know the condition could cause harm.]; *Hansen v. Academy, Ltd.,* 2006 OK CIV APP 63, 136 P.3d 725 [Question of fact existed as to whether boat trailer tongue was open and obvious.]; *Julian v. Secured Investment Advisors,* 2003 OK CIV APP 81, 77 P.3d 604 [Fact question regarding whether sidewalk debris constituted an open and obvious hazard precluded summary judgment.]; *Moore v. Albertson's, Inc.,* 2000 OK CIV APP 58, 7 P.3d 506[Question of fact existed as to whether spilled milk was an open and obvious danger.]

**29.** *Henryetta Constr.Co. v. Harris,* see note 24, supra.

**30.** *Roper v. Mercy Health Center,* 1995 OK 82, ¶ 5, 903 P.2d 314; *Spirgis v. Circle K Stores,* see note 34, infra.

**31.** *Zagal v. Truckstops Corp. of America,* 1997 OK 75, ¶ 9, 948 P.2d 273.

defect and avoid being injured.[32] **Nevertheless, it is well established in our jurisprudence that, where conflicting evidence is presented on the issue of the open and obvious nature of a defect, the question must be resolved by the trier of fact.[33] What would normally be considered an open and obvious danger may become a latent defect because of the conditions existing at the time of injury.[34]**

¶ 14 Despite Sholer's admissions indicating that she understood the dangers of diving into waters with an unknown depth, she also indicated that the pool's lighting made her believe that it would be safe to do a shallow-water dive. Based on what she observed, Sholer thought the water was as deep as five or six feet. Sholer specifically stated that her perception was linked to the pool's lighting which created shadows. Her rescuer bolstered Sholer's contentions by indicating that he could not determine the depth of the water until he entered the pool. We hold that the openness and obviousness of the dangerous condition and whether Sholer appreciated the risk are questions for the trier of fact[35] making the entrance of summary judgment inappropriate.

## CONCLUSION

 ¶ 15 The purpose of summary adjudication is not to substitute a trial by affidavit for one by the trier of fact, but rather to afford a method of summarily terminating a case when only questions of law remain.[36] The characteristics of the pool as a hidden or open hazard at the time of the injury present an issue of fact rather than one of law.[37] Based on the evidentiary materials presented, we find reasonable minds could differ on the question of whether conditions of the pool were so open and obvious as to eliminate all

duty of the apartment complex to the diver. Accordingly, the trial court erred when it entered summary judgment in favor of the apartment complex.

**CERTIORARI PREVIOUSLY GRANTED; COURT OF CIVIL APPEALS OPINION VACATED; DISTRICT COURT'S JUDGMENT REVERSED; AND MATTER REMANDED FOR FURTHER PROCEEDINGS.**

COLBERT, V.C.J., KAUGER, WATT, EDMONDSON, REIF, COMBS, GURICH, JJ. concur.

TAYLOR, C.J., with whom WINCHESTER, J. joins, dissenting:

I dissent. The trial court and the Court of Civil Appeals were correct and I would affirm their decisions. This case was properly ended by summary judgment. An intoxicated young woman decided to dive head first into a shallow swimming pool. A few feet from her dive was a marker clearly indicating the water was only three (3) feet deep. She admits that was a dangerous act on her part. The danger of diving into water of unknown depth is open and obvious. The combination of being under the influence of alcohol and diving head first into very shallow water will usually result in unfortunate serious injury. However unfortunate, this injury is not the legal responsibility of the apartment complex.

**32.** *Pickens v. Tulsa Metropolitan Ministry*, see note 22, supra; *Henryetta Constr. Co. v. Harris*, see note 24, supra; *Jack Healey Linen Serv. Co. v. Travis*, 1967 OK 213, ¶ 0, 434 P.2d 924.

**33.** *Miller v. David Grace, Inc.*, see note 34, infra; *Jack Healey Linen Service Co. v. Travis*, see note 32, supra.

**34.** See, *Miller v. David Grace, Inc.*, 2009 OK 49, ¶¶ 15–16, 212 P.3d 1223; *Roper v. Mercy Health Center*, see note 30, supra. See also, *Spirgis v.*

*Circle K Stores*, 1987 OK CIV APP 45, ¶ 11, 743 P.2d 682, ordered released for publication by the Oklahoma Supreme Court.

**35.** *Miller v. David Grace, Inc.*, see note 34, supra.

**36.** *Bowers v. Wimberly*, 1997 OK 24, ¶ 18, 933 P.2d 312; *Stuckey v. Young Exploration Co.*, 1978 OK 128, ¶ 15, 586 P.2d 726.

**37.** See, *Phelps v. Hotel Management, Inc.*, note 2, supra.